# In the United States Court of Federal Claims

No. 05-1205C
(Filed: October 29, 2007)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| NELSON CONSTRUCTION COMPANY, * | |
| and DONALD J. NELSON, * | |
| * | Government Contract; Subject Matter |
| Plaintiffs, * | Jurisdiction, RCFC 12(b)(1); Failure to |
| * | State a Claim, RCFC 12(b)(6); Sovereign |
| v. * | Immunity; Equitable Subrogation; |
| * | Assignment; Wrongful Payment; Suretyship; |
| THE UNITED STATES, * | Indemnitor; Subcontractor; Third-Party |
| * | Beneficiary. |
| Defendant. * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Kim J. Trout, Trout, Jones, GledHill, Fuhrman, P.A., Boise, ID, for plaintiffs.

Leslie Cayer Ohta, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

Pending before the court are two motions by defendant: Motion to Dismiss Counts One and Two of Plaintiffs' Amended Complaint, pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), and Motion to Dismiss Count Three of Plaintiffs' Amended Complaint, pursuant to RCFC 12(b)(1) and 12(b)(6).[1]  This case arises out of a contract with the Federal Highway Administration ("FHA") entered into in April 2001 to perform work on Idaho State Highway 21 (the "Project").  Plaintiff, Nelson Construction Company ("Nelson Construction") served as a subcontractor to the prime contractor, and Donald J. Nelson ("Nelson") and Nelson Construction served as indemnitors to the performance and payment bond surety.  For the reasons set forth below, the court grants Defendant's Motion to Dismiss Counts One and Two of Plaintiffs' Amended Complaint and denies Defendant's Motion to Dismiss Count Three of Plaintiffs' Amended Complaint.

---

[1] Together, the two motions address the entirety of the Amended Complaint.

# I. BACKGROUND

## A. Factual Background[2]

Lemhi Environmental Diversified ("Lemhi"), the prime contractor, entered into a contract in April 2001 with the FHA ("Contract") to perform work on Idaho State Highway 21.  See Am. Compl. ¶ 3.  Rod Ariwite ("Ariwite"), "a Native American Indian and member of the Lemhi Tribe," served as President of Lemhi, and Ariwite relied upon Nelson's assistance as a mentor "for purposes of obtaining Section 8(a) set aside work for Lemhi, in conjunction with [Nelson Construction]."  Id. ¶ 5.  Plaintiff Nelson is the owner of Nelson Construction, which was a subcontractor to Lemhi on the Contract.  Id. ¶¶ 2, 4.  Travelers Casualty & Surety Company of America ("Travelers") served as a performance and payment bond surety for Lemhi on the Project.[3]  Id. ¶ 7; see also id. Ex. A (copy of the payment bond).  Both Nelson and Nelson Construction served as indemnitors of Travelers on the performance and payment bonds for the Project.  Id. ¶ 16; see also id. Ex. E (copy of the indemnity agreement).

Soon after work on the Project began, Ariwite and Lemhi applied to the FHA for payment, and the FHA paid Lemhi for work Nelson Construction performed.  Id. ¶ 8.  Ariwite "created a false claim against" Nelson Construction and refused to pay funds owed to Nelson Construction on the Project.  Id.  Nelson Construction pursued legal action against Lemhi and Ariwite and obtained a judgment against Lemhi and Ariwite in an Idaho state court in the amounts of $514,797.45 and $453,281.14, respectively, which Nelson Construction has been unable to collect.  Id.  Nelson Construction informed the FHA's contracting officer ("CO") and the FHA's staff attorney that Lemhi had failed to pay Nelson Construction and that Lemhi had made "false applications for subsequent payment to Lemhi, through Ariwite, claiming that Lemhi had paid [Nelson Construction] when in fact, it had not."  Id. ¶ 9.

In the fall of 2001, Nelson Construction made a claim for payment upon the payment bond issued by Travelers.  Id. ¶ 10.  While Travelers was contractually obligated to pay on the bond, Travelers did not pay Nelson Construction because both Travelers and Nelson Construction realized that upon paying Nelson Construction for its work as a subcontractor on the construction project, Travelers would then immediately "seek payment back" from Nelson and Nelson Construction since plaintiffs were the indemnitors of Travelers.  Id.  At the end of the fall construction season, Nelson Construction notified Lemhi, Travelers, and the FHA's CO and

---

[2]  These facts are derived mainly from the Amended Complaint ("Am. Compl.") and the accompanying exhibits.  For purposes of its motions to dismiss, defendant accepts as true the factual allegations set forth in Plaintiffs' Amended Complaint.  See Defendant's Motion to Dismiss Counts One and Two of Plaintiffs' Amended Complaint ("First Motion to Dismiss" or "Def.'s First Mot.") 1 n.1.

[3]  The Miller Act requires prime contractors on federal construction projects exceeding $100,000.00 to post both payment and performance bonds.  See 40 U.S.C. § 3131 (2000).

staff attorney that it refused to continue performance on the Project unless alternative payment arrangements were made.  Id. ¶ 11.

On May 22, 2002, pursuant to an assignment agreement ("Assignment"), Lemhi assigned to Travelers all payments due under the Contract to "assure that future Project performance would be made to Travelers as an escrow holder for the benefit of" Nelson and Nelson Construction.[4]  See id. ¶ 12.  The Assignment stated:

> For value received[,] the undersigned Assignor does hereby assign, set over and transfer to Travelers Casualty & Surety Company of America, Assignee, of Auburn, Washington, all right, title and interest to all monies due or to become due Assignor from the U.S. Department of Transportation, Federal Highway Administration, Western Federal Lands Highway Division, construction contract number DTFH 70-01-C-00017, Atlanta Road, Boise National Forest, . . . (the "Project"), arising from the performance by Assignor of work on the Project.

Id. Ex. B.

The FHA's CO and staff attorney acknowledged receipt of the Assignment on May 28, 2002.  See id. ¶ 13; see also id. Ex. C (copy of the Notice of Assignment stamped received "FHWA-Vancouver," on May 28, 2002, at 12:47 p.m. in the "mail room").  The Notice of Assignment sent by Travelers to the government informed the government that (1) "money due or to become due under the contract . . . has been assigned to [Travelers]"; and (2) payments under the contract should be made to Travelers.[5]  Id. Ex. C.  From June 2002 until November 2002, the FHA made six consecutive payments to Travelers pursuant to the Assignment.  See id. ¶ 15.  However, on January 28, 2003, Lemhi and the government agreed to settle all claims pursuant to the Contract, and the government made a final payment to Lemhi, instead of Travelers, in the amount of $614,270.67.  Id. Ex. D.  But see Def.'s First Mot. 1-2 n.1 (stating that Lemhi received $269,270.67, and plaintiffs received $345,000.00); Defendant's Motion to Dismiss Count Three of Plaintiffs' Amended Complaint ("Second Motion to Dismiss" or "Def.'s Second Mot.") 6 n.6 (stating that plaintiffs received $375,000.00 as part of the settlement agreement).

---

[4]  Plaintiffs assert that Travelers entered into the Assignment for the "express purposes and benefit" of Nelson and Nelson Construction. Am. Compl. ¶ 8.  The Assignment, however, does not state that Travelers would act as the escrow holder for the benefit of Nelson and Nelson Construction.  See id. Ex. B.  In fact, the Assignment makes no mention of Nelson or Nelson Construction.

[5]  Travelers provided the name and address of its bank, routing number, account number, and account name.  Am. Compl. Ex. C.

## B.  Procedural Background

Plaintiffs filed their Complaint in this court on November 16, 2005.  Defendant filed a motion to dismiss on March 27, 2006, with plaintiffs' response filed on May 30, 2006, and defendant's reply filed on July 7, 2006.  The court held oral argument on defendant's motion to dismiss on October 11, 2006.  During oral argument, plaintiffs' counsel raised a legal theory, intended third-party beneficiary status, not pled in the Complaint.[6]  See Tr. I at 18-26.  The court granted plaintiffs' request to file an amended complaint.  Id. at 28-30.

Plaintiffs filed their Amended Complaint on October 30, 2006, and defendant filed its Answer on November 14, 2006.  Defendant then filed its First Motion to Dismiss on January 29, 2007, with Plaintiffs' Response ("Response to Defendant's First Motion to Dismiss" or "Pls.' Resp. to First Mot.") filed March 1, 2007, and Defendant's Reply ("Def.'s Reply to First Mot.") filed March 15, 2007.  Defendant then filed its Second Motion to Dismiss on February 22, 2007, with Plaintiffs' Response ("Response to Defendant's Second Motion to Dismiss" or "Pls.' Resp. to Second Mot.") filed April 6, 2007, and Defendant's Reply ("Def.'s Reply to Second Mot.") filed April 26, 2007.  Defendant filed a Notice of Additional Authority ("Notice" or "Def.'s Notice") on May 8, 2007, regarding Count Three of Plaintiffs' Amended Complaint and the issue of parol evidence.  Plaintiffs filed a response to the Notice on August 31, 2007, with Defendant's Reply ("Def.'s Reply") filed September 7, 2007.  The court heard oral argument on both of defendant's motions on September 27, 2007 ("Tr. II").

## II.  LEGAL STANDARDS

### A.  Tucker Act Jurisdiction

The United States Court of Federal Claims ("Court of Federal Claims") is a court of limited jurisdiction.  See Brown v. United States, 105 F.3d 621, 623 (Fed. Cir. 1997).  The scope of this court's jurisdiction to entertain claims and grant relief depends upon the extent to which the United States has waived its sovereign immunity.  See United States v. King, 395 U.S. 1, 4 (1969).  In "construing a statute waiving the sovereign immunity of the United States, great care must be taken not to expand liability beyond that which was explicitly consented to by Congress."  Fid. Constr. Co. v. United States, 700 F.2d 1379, 1387 (Fed. Cir. 1983).  A waiver of sovereign immunity "cannot be implied but must be unequivocally expressed."  King, 395 U.S. at 4.  Therefore, except when Congress consents to a cause of action against the United States, "there is no jurisdiction in the Court of Claims more than in any other court to entertain suits against the United States."  United States v. Sherwood, 312 U.S. 584, 587-88 (1941).

---

[6]  Plaintiffs' counsel advised the court that the night before oral argument, he discovered case law that he believed was directly relevant to his argument.  See October 11, 2006 Transcript of Oral Argument ("Tr. I") 29-30.  Plaintiffs' counsel had failed to cite those authorities in briefing nor had counsel notified the court or opposing counsel of such case law prior to oral argument.  Id. at 25-30.

The Tucker Act both confers jurisdiction upon the Court of Federal Claims and waives sovereign immunity with respect to certain actions for monetary relief filed against the United States.  See United States v. Mitchell, 463 U.S. 206, 212-18 (1983).  Under the Tucker Act, sovereign immunity is waived for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort."  28 U.S.C. § 1491(a)(1) (2000).

The Tucker Act itself, however, does not establish a substantive right of recovery.  Hammitt v. United States, 69 Fed. Cl. 165, 168 (2005) (citing United States v. Mitchell, 445 U.S. 535, 538 (1980); and United States v. Testan, 424 U.S. 392, 398 (1976)).  The plaintiff must establish that the law relied upon "can fairly be interpreted as mandating compensation by the Federal Government for the damages sustained."  Testan, 424 U.S. at 400 (quoting Eastport S.S. Corp. v. United States, 178 Ct. Cl. 599, 607 (1967)).

### B.  Motion to Dismiss - RCFC 12(b)(1)

Subject matter jurisdiction may be challenged at any time by the parties, by the court sua sponte, or on appeal.  Gen-Probe, Inc. v. Vysis, Inc., 359 F.3d 1376, 1379 (Fed. Cir. 2004).  When considering an RCFC 12(b)(1) motion, the burden of establishing the court's subject matter jurisdiction resides with the party seeking to invoke it.  See McNutt v. Gen. Motors Acceptance Corp. of Ind., 298 U.S. 178, 189 (1936).  The plaintiff "bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence."  Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court must accept as true the allegations in the plaintiff's complaint and must construe such facts in the light most favorable to the nonmoving party.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Reynolds, 846 F.2d at 747.  If the defendant or the court questions jurisdiction, the plaintiff cannot rely solely on allegations in the complaint but must bring forth relevant, adequate proof to establish jurisdiction.  See McNutt, 298 U.S. at 189.  In deliberating a motion to dismiss for lack of subject matter jurisdiction, the court may examine relevant evidence in order to decide any factual disputes.  See Moyer v. United States, 190 F.3d 1314, 1318 (Fed. Cir. 1999); Reynolds, 846 F.2d at 747.

### C.  Motion to Dismiss - RCFC 12(b)(6)

The United States Supreme Court ("Supreme Court") recently clarified the standard with respect to what a plaintiff must plead to survive a Rule 12(b)(6) motion.  Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955 (2007).  The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  Id. at 1964-65 (citations & quotation marks omitted).  Further, the Court pointed out that while a complaint does not need to contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true

(even if doubtful in fact)."[7]  Id. (internal citation & quotation marks omitted).  Thus, in reviewing an RCFC 12(b)(6) motion, this court "must assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant."  United Pac. Ins. Co. v. United States, 464 F.3d 1325, 1327-28 (Fed. Cir. 2006) (citations & quotation marks omitted). Additionally, this court must decide "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'"  Swierkiewicz v. Sorema N.A., 534 U.S. 506, 511 (2002) (quoting Scheuer, 416 U.S. at 236).

## III. DISCUSSION

Plaintiffs set forth three theories for recovery.  See Am. Compl. ¶¶ 28-41.  First, in Count One, plaintiffs assert that Lemhi assigned its rights to payment under the Contract to the performance and payment bond surety, Travelers, upon Lemhi's default.  Id. ¶ 12.  According to plaintiffs, the Assignment provides that Travelers was to receive funds from the government for the express purpose of holding those monies in escrow for plaintiffs' future performance.  Id. Plaintiffs allege that the government "demonstrated to Ariwite how to change the payment provisions of the contract so that Ariwite could arrange to be paid the remaining contract proceeds directly."  Pls.' Resp. to First Mot. 3.  Plaintiffs further allege that the FHA's CO and/or staff attorney modified the payment arrangement to "make [electronic funds transfer] payment directly to a new bank account established by Ariwite in Utah, not previously used by Ariwite or Lemhi for this project."  Am. Compl. ¶ 19.  Thus, because the government failed to pay Travelers, plaintiffs maintain that, in their role as indemnitors to Travelers, they are equitably subrogated to Travelers' rights to pursue a claim against the government for those funds.  Id. ¶¶ 30-31.  Defendant counters that because plaintiffs were not named as assignees in the Assignment, the Court of Federal Claims lacks jurisdiction over plaintiffs' claim for wrongful payment.  Def.'s First Mot. 4-5.

Plaintiffs next assert in Count Two that in their role as indemnitors, they were "equitably subrogated holders" of Travelers' rights against the government.  Am. Compl. ¶ 36.  Specifically, plaintiffs argue that Travelers, as the payment bond surety, was obligated to pay subcontractors, including Nelson Construction, upon Lemhi's default.  Id. ¶ 34.  As indemnitors of the payment and performance bonds, plaintiffs contend that they were obligated to pay Travelers for payments Travelers made on the payment bond.  Id. ¶ 35.  Thus, plaintiffs maintain that the doctrine of equitable subrogation permits plaintiffs to step into the shoes of Travelers and bring an action seeking recovery against the United States in this court.[8]  Id. ¶ 36.  In response, defendant argues

---

[7]  In so holding, the Supreme Court abrogated the 12(b)(6) standard set forth in Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Bell Atl., 127 S. Ct. at 1969.

[8]  Equitable subrogation allows one party "who has been compelled to satisfy an obligation (either the payment of money or contract performance) which was the responsibility of another, to a cession of all the remedies which the creditor might have against the other."  District of Columbia v. Aetna Ins. Co., 462 A.2d 428, 430 (D.C. 1983).  The doctrine finds its basis not in statutory law but in the "judicial commitment" to ensuring fairness and equity among

that the Court of Federal Claims has applied the doctrine of equitable subrogation only to permit a surety to file a claim against the United States. Def.'s First Mot. 6. Thus, defendant argues, because plaintiffs are indemnitors, not sureties, they lack standing to maintain an action against the government in this court. Id.

In Count Three of the Amended Complaint, plaintiffs argue that as subcontractors, they are intended third-party beneficiaries of "the agreement between the prime contractor and the Government to modify the remittance terms of the prime contract; and/or . . . the Assignment Agreement assented to by the Government." Pls.' Resp. to Second Mot. 1-2. To support this proposition, plaintiffs assert that "as a condition to returning to the Project for completion in spring of 2002," they requested that Travelers serve as an escrow holder for payments payable to Lemhi under the Contract. Am. Compl. ¶ 38. Plaintiffs contend that the FHA "understood that Travelers would be acting as an escrow agent for purposes of distributing payments to" the plaintiffs, "as part of a class of creditor beneficiaries for present or future obligations of Lemhi on the Project." Id. ¶ 39. Defendant disputes plaintiffs' view, arguing that this court lacks subject matter jurisdiction over Count Three of the Amended Complaint because plaintiffs were not "a third-party beneficiary of a contract to which the Government is a party." Def.'s Second Mot. 5. Defendant further argues that, even assuming that the government was a party to the contract between Lemhi and Travelers (the Assignment), "Lemhi's assignment to Travelers does not demonstrate an express intent to benefit" plaintiffs. Id. at 6. Thus, defendant maintains that plaintiffs fail to state a claim upon which relief can be granted. Id. at 10.

Lastly, defendant asserts that the settlement agreement that was negotiated between Lemhi and the government, "with input from" plaintiffs, "resulted in a payment to [plaintiffs] of $375,000, the amount that Nelson claimed was due and owing for its performance under the contract." Id. at 6 n.6. Thus, defendant states that plaintiffs appear to be seeking an additional amount allegedly owed to plaintiffs by Lemhi "based upon circumstances wholly unrelated to the contract between Lemhi and the Government, an amount that neither the Government nor Travelers is in any way legally or factually obligated to pay." Id.

## A. Count One: Equitable Subrogation and the Assignment

Plaintiffs argue that they are equitably subrogated to Travelers' rights for purposes of jurisdiction because when the government "failed to pay Travelers, Travelers['] loss was passed to Nelson and Nelson Construction." Pls.' Resp. to First Mot. 7. Although defendant does not contest the validity of the Assignment for the purpose of its First Motion to Dismiss,[9] Def.'s

---

parties. Transamerica Ins. Co. v. United States, 989 F.2d 1188, 1194 (Fed. Cir. 1993). Thus, a party's right to subrogation is enforced for the purpose of accomplishing justice, and is "independent of any contractual relations between the parties." Memphis L.R.R. Co. v. Dow, 120 U.S. 287, 301-02 (1887).

[9] Both the Assignment of Claims Act, 31 U.S.C. § 3727 (2000), and the Assignment of Contract Act, 41 U.S.C. § 15 (2000), (collectively, "Anti-Assignment Acts") govern assignment

Reply to First Mot. 2, defendant argues that because plaintiffs cannot demonstrate that they are in privity of contract with the government, plaintiffs lack standing to pursue a claim against the government.  Def.'s First Mot. 4-5.  Because plaintiffs are indemnitors of Travelers, defendant argues that plaintiffs only recourse is against Lemhi.  Def.'s Reply to First Mot. 2.  For purposes of ruling on defendant's motions to dismiss, the court assumes that the Assignment was valid.  Now, the court must determine whether plaintiffs are subrogated to Travelers' rights under the Assignment, and whether plaintiffs may seek recovery from the government for the government's wrongful payment to Lemhi and Ariwite.

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") and its predecessor court, the United States Court of Claims ("Court of Claims"), have long held that an assignee to the proceeds of a government contract under the Assignment of Claims Act may sue the government to recover payments for work performed by the contractor.  Ins. Co. of the W. v. United States ("ICW"), 243 F.3d 1367, 1374-75 (Fed. Cir. 2001), remanded to 55 Fed. Cl. 529 (2003); Merchs. Nat'l Bank of Mobile v. United States, 689 F.2d 181, 184 (Ct. Cl. 1982); Tuftco Corp. v. United States, 614 F.2d 740, 746 (Ct. Cl. 1980); Produce Factors Corp. v. United States, 467 F.2d 1343, 1348 (Ct. Cl. 1972).  However, assignees cannot recover against the government on a breach of contract claim when there is no privity of contract between the assignee and the government.  Produce Factors, 467 F.2d at 1347 (dismissing plaintiff/assignee's claim for breach of contract because the assignment did not establish privity of contract between the assignee and the government); id. at 1348 (noting that the rights of an assignee are "'limited to its right to receive money under the contract'" (citation omitted)); Twin City Shipyard, Inc. v. United States, 21 Cl. Ct. 582, 588 (1990) ("[A] valid assignment of contract proceeds, standing alone, does not create privity of contract between the assignee and the United States."); Thomas Funding Corp. v. United States, 15 Cl. Ct. 495, 499-500 (1988) (dismissing plaintiff's claim for breach of contract because plaintiff/assignee lacked privity with the government).  Instead, when there is no

---

of government contracts.  The intent of the Assignment of Claims Act is to allow the government to deal exclusively with the original claimant and to place the government on notice of its obligations.  Patterson v. United States, 173 Ct. Cl. 819, 823 (1965).  The prohibition against the assignment of claims was intended to prevent multiple payments of claims, make unnecessary the investigation of assignments, and eliminate the risk of double payment or multiple liability.  Stearns Co. v. United States, 34 Fed. Cl. 264, 270 (1995); Patterson, 173 Ct. Cl. at 823.

Notwithstanding any requirements of the Anti-Assignment Acts, "assigned contracts are valid when the assignment takes place by operation of law or when the government consents to and recognizes the assignment."  Rochester Gas & Elec. Corp. v. United States, 65 Fed. Cl. 431, 437 (2005).  In the case sub judice, the government acknowledged receipt of the Notice of Assignment on May 28, 2002.  Am. Compl. Ex. C.  Further, the government acted pursuant to the Assignment, as evidenced by the six consecutive payments made to Travelers from June 2002 until November 2002.  Id. ¶¶ 13, 15; Def.'s First Mot. 2.

privity between the assignee and the government, the assignee "may only bring a suit against the government for wrongful payment to a third party."[10]  Thomas Funding, 15 Cl. Ct. at 502.

Based on the principles described above, plaintiffs contend that "[c]ourts have consistently and broadly" held that assignees and subrogees of the contractor have standing to sue the government in this court.  Pls.' Resp. to First Mot. 7; see also id. (citing the following cases: Pearlman v. Reliance Ins. Co., 371 U.S. 132, 138 (1962); Prairie State Nat'l Bank of Chicago v. United States, 164 U.S. 227, 231 (1896); Aetna Cas. & Sur. Co. v. United States, 845 F.2d 971, 974 (Fed. Cir. 1988); Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161 (Fed. Cir. 1985); ICW, 55 Fed. Cl. at 533; Transamerica Ins. Co. v. United States, 31 Fed. Cl. 532, 535 (1994); and Westech Corp. v. United States, 20 Cl. Ct. 745, 749 (1990)).  To bolster their argument, plaintiffs assert that "for jurisdictional purposes, the focus is on the claim, not the claimant."  Id. (relying on cases such as ICW, 243 F.3d at 1373; and Liberty Mut. Ins. Co. v. United States, 70 Fed. Cl. 37, 53 (2006)).

In fact, the Federal Circuit's decision in ICW appears to support plaintiffs' theory.  The Federal Circuit, in discussing a Federal Tort Claims Act case, United States v. Aetna Casualty & Surety Co., 338 U.S. 366 (1949), explained:

> Aetna reflects a broader and more generally applicable legal principle: waivers of sovereign immunity applicable to the original claimant are to be construed as extending to those who receive assignments, whether voluntary assignments or assignments by operation of law, where the statutory waiver of sovereign immunity is not expressly limited to waivers for claims asserted by the original claimant.

ICW, 243 F.3d at 1373.  However, cases subsequent to ICW have agreed that the expansive language referred to by plaintiffs in the ICW decision is mere dicta.  Centers v. United States, 71 Fed. Cl. 529, 533 (2006); Commercial Cas. Ins. Co. of Ga. v. United States, 71 Fed. Cl. 104, 108 (2006).  The Federal Circuit's holding in ICW was limited to the narrow issue of whether "a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act, 28 U.S.C. § 1491, and bring suit against the United States." 243 F.3d at 1369.  In ICW, the Federal Circuit concluded that a surety who was subrogated to the rights of the prime contractor could depend upon the waiver of sovereign immunity and file a claim against the government.  Id. at 1375.  Consequently, while there is no privity of contract between the government and a surety, sureties have traditionally asserted

---

[10]  Once the government receives notice of the assignment, the government has a duty to make payments directly to the assignee for work performed by the assignor.  Thomas Funding, 15 Cl. Ct. at 502.  As noted above, the government acknowledged receipt of the Assignment between Lemhi and Travelers.  Am. Compl. Ex. C.  Any failure on the part of the government to make payments to the assignee allows the assignee (Travelers in the instant case) to file suit against the government in the Court of Federal Claims under the Assignment of Claims Act.  Thomas Funding, 15 Cl. Ct. at 502.  In the case sub judice, the surety assignee declined to file suit against the government as a result of the government's failure to pay the proper party.

claims against the government pursuant to the doctrine of equitable subrogation.  ICW, 55 Fed. Cl. at 533.  After a surety finances or completes the performance of the defaulted contractor and "discharges the outstanding claims of subcontractors, it may subrogate to the rights of both the defaulted contractor and subcontractors."  Id. at 538.  Cases decided by the Federal Circuit and the Court of Federal Claims discussing ICW have explained that the decision merely reaffirms the long settled principle of equitable subrogation as permitting a surety to sue the government.[11] Fireman's Fund Ins. Co. v. England, 313 F.3d 1344, 1352 (Fed. Cir. 2002); Liberty Mut. Ins., 70 Fed. Cl. at 42-43; Nova Cas. Co. v. United States, 69 Fed. Cl. 284, 296 n.12 (2006); U.S. Fire Ins. Co. v. United States, 61 Fed. Cl. 494, 500-01 (2004); Westchester Fire Ins. Co. v. United States, 52 Fed. Cl. 567, 574 (2002).

In the instant case, Travelers, as assignee to the government contract proceeds, had standing to maintain an action pursuant to the Assignment against the government for wrongful payment.[12]  Merch.'s Funding Group v. United States, 33 Fed. Cl. 445, 450 (1995) (finding that a wrongful payment claim based upon an assignment can only be pursued by the assignee); see also 41 U.S.C. § 15 (providing that an assignee of any assignment of a government contract must provide notice of the assignment with a copy of the "instrument of assignment").  Here, plaintiffs

_____

[11]  Each of the additional cases plaintiffs rely upon in their Response to Defendant's First Motion to Dismiss involved a surety that filed suit against the government based on the doctrine of equitable subrogation.  Pearlman, 371 U.S. at 141-42 (involving a surety that sued the government pursuant to equitable subrogation when the surety financed a project to completion after default by the prime contractor); Prairie State, 164 U.S. at 231-32 (determining that a surety was entitled to assert equitable subrogation against the government); Aetna Cas. & Sur., 845 F.2d at 974-76 (holding that a performance bond surety was allowed to sue the government based on the doctrine of equitable subrogation); Balboa, 775 F.2d at 1162-63 (ruling that a surety could maintain an action against the government to recover an allegedly improper progress payment after the surety notified the government of the contractor's default); Transamerica Ins., 31 Fed. Cl. at 536 (holding that a performance bond surety was allowed to sue the government based on the doctrine of equitable subrogation); Westech, 20 Cl. Ct. at 750-51 (confirming that a surety is allowed to sue the government when the surety takes over the contract; however, the recovery is limited to funds held by the government or improperly disbursed to a third party but only up to the amount of the contract balance).

[12]  In another case, the Court of Federal Claims held that when the government wrongfully paid the original contractor, despite the surety's notice to the government that the original contractor was in default, the court had jurisdiction to hear the claim of a Miller Act surety against the government.  See generally Balboa, 775 F.2d 1158.  Balboa lists several factors that courts have considered when determining whether the government has exercised reasonable discretion in distributing funds.  Id. at 1164-65 (including factors such as whether the contract was subsequently completed by the contractor and whether the payments to the contractor subsequently reached the subcontractors).  However, the case sub judice is readily distinguishable from Balboa because in the instant case, plaintiffs did not serve as sureties on either of the bonds.

were not assignees.  Indeed, neither Nelson nor Nelson Construction was a party to the Assignment.  Am. Compl. Ex. B.  To the contrary, plaintiffs chose to serve both as indemnitors and subcontractors on the same government contract.  Plaintiffs failed to cite, and the court is unaware of, any binding precedent that allows indemnitors, by invoking the doctrine of equitable subrogation, to proceed in the place of the assignee against the government in the Court of Federal Claims.  Moreover, to allow plaintiffs to proceed against the government as a successor to Travelers' rights would violate the purposes of the Assignment of Claims Act.  See Am. Nat'l Bank & Trust Co. v. United States, 23 Cl. Ct. 542, 546 (1991) (stating the Assignment of Claims Act was enacted "to protect the Government from secret assignment arrangements, to prevent possible multiple claims, and to make unnecessary the investigation of alleged assignments").  Thus, plaintiffs' argument lacks merit and Count One of Plaintiffs' Amended Complaint is dismissed for lack of subject matter jurisdiction.

### B.  Count Two: Equitable Subrogation and the Indemnity Agreement

Next, plaintiffs assert that they are equitably subrogated to Travelers' rights pursuant to the indemnity agreement between plaintiffs and Travelers.  Pls.' Resp. to First Mot. 10.  Specifically, plaintiffs maintain that their status as indemnitors under the payment and performance bonds allows them to "step into the shoes" of Travelers, and because "Travelers was wearing Lemhi's shoes," Nelson and Nelson Construction are conferred with the rights of the prime contractor.  Id. at 10-11.  Before addressing plaintiffs' claims, the court first explains the circumstances under which a surety has been afforded standing in this court.

### 1.  Suretyship and Equitable Subrogation

As noted above, the Miller Act requires that a contractor performing "construction, alteration, or repair of any public building or public work of the Federal Government" must post two types of bonds for contracts over $100,000.00.  40 U.S.C. § 3131(b).  First, the contractor must post a "performance bond with a surety . . . in an amount . . . adequate, for the protection of the Government" against a contractor's default.  Id. § 3131(b)(1).  When issuing a performance bond, a surety guarantees performance of the contract and completion of the project if the bonded contractor defaults.  See Aetna Cas. & Sur., 845 F.2d at 973-74.  Should the contractor default, a performance bond allows the surety three options: (1) assume the contract and complete performance; (2) assume liability for the government's costs in completing the contract that exceed the contract price; or (3) provide funds to an insolvent contractor to complete performance.  ICW, 243 F.3d at 1370.  In addition to a performance bond, the contractor must also post a "payment bond with a surety . . . for the protection of all persons supplying labor and material in carrying out the work provided for in the contract."  40 U.S.C. § 3131(b)(2).

There are two instances that confer standing on a surety to maintain an action against the government in the Court of Federal Claims.  First, a surety may assert its own rights under a takeover agreement between the surety and the government for assuming the obligations of the defaulting contractor.  Preferred Nat'l Ins. Co. v. United States, 54 Fed. Cl. 600, 603 (2002).

-11-

Second, if a surety to a bonded contract with the government is unable to establish a valid claim against the government based on privity of contract, the surety may invoke the doctrine of equitable subrogation.  Id.  The Federal Circuit has long held that a surety has standing to sue the government in the Court of Federal Claims under the doctrine of equitable subrogation.  Admiralty Constr., Inc. v. Dalton, 156 F.3d 1217, 1221 (Fed. Cir. 1998); see also Prairie State, 164 U.S. at 231 ("That [plaintiff], as surety on the original contract, was entitled to assert the equitable doctrine of subrogation is elementary.").

    Pursuant to the doctrine of equitable subrogation, either a payment bond or performance bond surety, has standing to sue the government because the government "is clearly the primary beneficiary of the surety's obligation and it would be inequitable to allow it to retain monies which it has previously agreed to pay for work done."  Universal Sur. Co. v. United States, 10 Cl. Ct. 794, 799 (1986); see also Nat'l Sur. Corp. v. United States, 118 F.3d 1542, 1545-46 (Fed. Cir. 1997) ("The surety's rights and obligations are not based on third-party beneficiary concepts, but on principles of suretyship law.").  Specifically, there are two instances in which a surety can succeed to the contractual rights of the original contractor against the government: (1) when the surety takes over performance pursuant to the contract; or (2) when the surety finances completion of the defaulted contract.  See Admiralty Constr., 156 F.3d at 1222; Aetna Cas. & Sur., 845 F.2d at 975.  Further, because there are "rights running directly between the surety and the United States when the performance bond is called upon," the surety clearly has standing to pursue a claim against the government.  U.S. Fire Ins., 61 Fed. Cl. at 500.  The Court of Claims elaborated on the rights of Miller Act sureties to sue the government:

> [T]he surety was entitled to the benefit of all the rights of the laborers and materialmen whose claims it paid and those of the contractor whose debts it paid. The surety then is subrogated to the rights of the contractor who could sue the Government since it was in privity of contract with the United States.  The surety is likewise subrogated to the rights of the laborers and materialmen who might have superior equitable rights to the retainage but no right to sue the [United States].

U.S. Fid. & Guar. Co. v. United States, 475 F.2d 1377, 1382 (Ct. Cl. 1973).

    More recently, the Federal Circuit in National American Insurance Co. v. United States ("National American") upheld the long-established principle that a surety may assert the doctrine of equitable subrogation in this court against the government.  498 F.3d 1301, 1304 (Fed. Cir. 2007).  On June 11, 1996, Innovative PBX Services, Inc. ("IPBX") entered into a contract with the government to replace the telephone system at the Department of Veterans Affairs Medical Center in Palo Alto, California.  Id. at 1303.  IPBX worked with a subcontractor, Nortel Communications Systems, Inc., which was succeeded by Wiltel Communications, LLC ("Wiltel") for part of the contract performance.  Id.  Pursuant to the requirements of the Miller Act, IPBX executed payment and performance bonds with National American Insurance Company ("NAICO").  Id.  Once Wiltel completed performance, it informed NAICO that it was due approximately $675,000.00 for labor and materials that IPBX had failed to pay.  Id.  NAICO,

pursuant to the payment bond, settled the claim with Wiltel, informed the government that no additional payments should be made to IPBX, and requested that any remaining contract funds be held for NAICO.  Id.  Despite NAICO's request, the government made its final contract payment to IPBX.  Id.

Consequently, NAICO filed suit against the government in the Court of Federal Claims, and the court granted summary judgment in NAICO's favor.  Id.  The court held that NAICO was equitably subrogated to IPBX's rights because NAICO had satisfied its obligations under the payment bond; thus, the Tucker Act's waiver of sovereign immunity extended to NAICO as a subrogee of IPBX.  Id.  Further, the court determined that once NAICO put the government on notice, the government became a stakeholder and it violated its duty as a stakeholder by making the final payment to IPBX.  Id.

Before the Federal Circuit, the government argued that NAICO could only stand in the shoes of a subcontractor whom it paid, and because a subcontractor lacked privity with the government, the Tucker Act's waiver of sovereign immunity did not extend to NAICO.  Id. at 1304.  The Federal Circuit, after a review of relevant long-standing Supreme Court and Federal Circuit case law, upheld the decision of the Court of Federal Claims.  Id. at 1304-07 (analyzing cases, including Pearlman, 371 U.S. 132; United States v. Munsey Trust Co., 332 U.S. 234 (1947); Prairie State, 164 U.S. 227; and U.S. Fid. & Guar., 475 F.2d 1377).  The Federal Circuit in National American reaffirmed "the established precedent that a payment bond surety that discharges a contractor's obligation to pay a subcontractor may be equitably subrogated to the rights of the contractor."  Id. at 1307.

As explained below, because plaintiffs are not sureties, they fail to establish that they are subrogated to the rights of Lemhi.

## 2.  Plaintiffs Fail to Establish That This Court Has Jurisdiction Over Their Claims Pursuant to the Indemnity Agreement.

Plaintiffs argue that Travelers was obligated to pay Nelson Construction and other subcontractors as the payment bond surety, Am. Compl. ¶ 34, and that plaintiffs, as indemnitors of the payment and performance bonds, were obligated to pay Travelers for payments made by Travelers pursuant to the payment bond, id. ¶ 35.  Thus, plaintiffs assert that they are the "equitably subrogated holders of Travelers' rights" against the government and are entitled to payment in the amount of $269,270.67.  Id. ¶ 36.  Defendant counters that because it is undisputed that plaintiffs were not sureties in connection with the Contract, "there is absolutely no authority for the proposition that this Court possesses jurisdiction to entertain [plaintiffs'] claim."  Def.'s First Mot. 6 (noting that though "this Court has held that it possesses jurisdiction to entertain claims brought under the doctrine of equitable subrogation, those claims must be brought by the surety and then only under limited circumstances").

As noted above, Lemhi secured performance and payment bonds with Travelers.  See Am. Compl. ¶ 7, Ex. A.  The relationship between Travelers, Lemhi, and the government established a suretyship, or a "three-party agreement," pursuant to which Travelers, the surety, became liable for Lemhi's obligations to a third party, the government.  Balboa, 775 F.2d at 1160 ("A suretyship is the result of a three-party agreement, whereby one party (the surety) becomes liable for the principal's or obligor's debt or duty to the third-party obligee.").  Indeed, the parties agree that Travelers, as the Miller Act surety, was obligated to pay claims made to it by subcontractors and vendors providing goods and services under the Contract.  Def.'s First Mot. 5; Pls.' Resp. to First Mot. 10.  The parties also agree that plaintiffs, as indemnitors to Travelers under the payment bond, were obligated to indemnify Travelers for payments made by Travelers pursuant to the payment bond.  Am. Compl. ¶ 35; Def.'s First Mot. 5-6; Pls.' Resp. to First Mot. 10.  However, the parties disagree over whether plaintiffs are equitably subrogated to Travelers' rights, as a surety, against the government in this court.  Def.'s First Mot. 6; Pls.' Resp. to First Mot. 10.

Similar to Count One, plaintiffs argue in relation to Count Two that "[c]ourts have consistently and broadly" held that subrogees of the prime contractor have standing to sue in this court, and that for jurisdictional purposes, the focus is on the claim, not the claimant.  Pls.' Resp. to First Mot. 7.  However, case law has long held that generally, privity of contract must exist between a party and the government; otherwise, sovereign immunity serves as a bar to claims against the government in the Court of Federal Claims.  See Anderson v. United States, 344 F.3d 1343, 1351 (Fed. Cir. 2003); Erickson Air Crane Co. of Wash. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984).  In cases where a party cannot rely upon privity of contract, a surety has standing to pursue recovery from the government in the Court of Federal Claims based upon the doctrine of equitable subrogation.  See, e.g., Admiralty Constr., 156 F.3d at 1221 (noting that Federal Circuit case law "has long established that a surety can sue the Government in the Court of Federal Claims under the non-contractual doctrine of equitable subrogation"); Balboa, 775 F.2d at 1160-61 (same).

Plaintiffs cite to several cases to establish that an indemnitor of a surety has standing against the government in this court pursuant to the legal principle of equitable subrogation.  For example, plaintiffs rely on a decision by the United States Court of Appeals for the Ninth Circuit ("Ninth Circuit"), Dannerbeck v. Palmer, for the principle that an indemnitor who has fulfilled its obligation to a surety pursuant to the indemnity agreement is subrogated to all of the surety's rights with respect to available funds.  Pls.' Resp. to First Mot. 8-9 (citing Dannerbeck v. Palmer, 502 F.2d 686, 689 (9th Cir. 1974)).  However, decisions of the Ninth Circuit are not binding on the Court of Federal Claims.  See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of the Supreme Court, [the Federal Circuit], and [the Federal Circuit's] predecessor court, the Court of Claims.").  Further, Dannerbeck involved the doctrine of equitable subrogation between private parties.  See generally 502 F.2d 686.  Not all principles that apply to private parties have similar application in actions against the federal government.  For example, unlike private parties, the government must consent to be sued.  King, 395 U.S. at 4 (stating that

a waiver of sovereign immunity "cannot be implied but must be unequivocally expressed");
Sherwood, 312 U.S. at 587-88 (noting that except when Congress consents to a cause of action
against the United States, "there is no jurisdiction in the Court of Claims more than in any other
court to entertain suits against the United States").  Consequently, the holding in Dannerbeck has
no application to the case sub judice.

However, the decision in George W. Kane, Inc. v. United States, 26 Cl. Ct. 655, 659
(1992), is analogous to the case sub judice.  In that case, plaintiff Kane was hired by the surety,
Hartford Accident & Indemnity Company, to complete performance after the contractor's
default.  Kane, 26 Cl. Ct. at 657.  Kane's appointment as the completion contractor was
documented in a surety takeover agreement, which was executed by the surety and the
government and signed by representatives of the surety, the contractor, and the government, but
not by Kane.  Id.  In dismissing Kane's claims against the government, the court reasoned that
though the surety requested that Kane complete the work, the indemnity agreement between the
surety, the contractor, and Kane did not "confer standing upon [Kane] to bring suit against the
United States."  Id. at 658.  Significantly, the court found that plaintiff was "not a subrogee to all
of the rights and responsibilities of the original contractor."  Id.  Kane emphasized that although
the plaintiff may have signed the indemnity agreement, as did the surety and the original
contractor, the government was not a party to this agreement, which was the critical missing
factor.  Id. at 660.  Further, "[t]he government did not sign any document with Kane," and there
"is no language in the Surety Takeover Agreement which even purports that the government has
agreed to be obligated to Kane."  Id.  The decision in Kane turned on whether the plaintiff was in
privity with the government.  Id.  In its ruling, the court explained that because plaintiff was
"neither a party to the original contract, nor a signatory to the Surety Takeover Agreement," Kane
was not in privity of contract with the United States; therefore, Kane lacked standing to bring suit
against the government.  Id.; see also Thomas Funding, 15 Cl. Ct. at 499 (stating that privity of
contract is "an indispensable prerequisite to the maintenance of a suit in this court against the
government under the Tucker Act").  For this reason, Kane lacked standing to sue the United
States in the Court of Federal Claims.  Kane, 26 Cl. Ct. at 658-59.

Similarly, in the case sub judice, plaintiffs as indemnitors rely upon subrogation concepts
to maintain an action against the government.  According to plaintiffs, upon Lemhi's default,
Travelers stepped into Lemhi's shoes to comply with the payment and performance bonds.
Plaintiffs chose to serve as indemnitors of the payment and performance bonds to Travelers.
Thus, plaintiffs argue they are entitled to step into two pairs of shoes–they seek to step into the
shoes of Lemhi, by way of wearing Travelers' shoes, to maintain an action against the
government.  Plaintiffs cannot leapfrog their way into the position of the prime contractor.  That
role lies exclusively with Travelers.  Plaintiffs seek to recover losses from the government since,
pursuant to their indemnification agreement with Travelers, they cannot recover from Travelers.
If plaintiffs demanded payment from Travelers pursuant to the payment bond for Nelson
Construction's performance as a completion contractor, and Travelers paid under the bond,
Travelers' immediate next step would be to demand those same monies be returned by plaintiffs
because they are indemnitors under the agreement.  Further, plaintiffs admit that they have been

unable to recover on the judgments against Lemhi and Ariwite.  Thus, plaintiffs are before this court to collect from the only available deep pocket–the government.

However, because the doctrine of equitable subrogation in the Court of Federal Claims generally has allowed only a surety to succeed to the rights of the original contractor against the government, plaintiffs must instead rely upon establishing privity of contract with the government.  Just as in Kane, the government in the instant case did not sign any agreement with plaintiffs.  As neither a party to the Contract, nor a party to the Assignment, plaintiffs, in their role as indemnitors, are not in privity of contract with the government.  Plaintiffs' claim against the government based upon the theory of equitable subrogation is not viable.  Further, to allow plaintiffs to pursue a claim against the government would be inequitable.  Thus, Count Two of the Amended Complaint is dismissed for lack of subject matter jurisdiction.

### C.  Count Three: Third-Party Beneficiary Status[13]

Count Three of the Amended Complaint asserts that the government understood that Travelers would serve as an escrow agent for purposes of distributing payments to plaintiffs; thus, plaintiffs argue they are "part of a class of creditor beneficiaries for present or future obligations of Lemhi."  Am. Compl. ¶ 39; see also Pls.' Resp. to Second Mot. 7 (maintaining that they are "'creditor beneficiaries' of the Prime Contract [and] are entitled to sue under the original cont[r]act").  More specifically, in their Response to Defendant's Second Motion to Dismiss, plaintiffs contend that they are third-party beneficiaries of the "agreement between the prime contractor and the Government to modify the remittance terms of the prime contract; and/or . . . the Assignment Agreement assented to by the Government."  Pls.' Resp. to Second Mot. 1-2.

In its Second Motion to Dismiss, defendant asserts that this court lacks subject matter jurisdiction over plaintiffs' third-party beneficiary claim, or in the alternative, that Count Three of the Amended Complaint fails to state a claim upon which relief may be granted.  Def.'s Second Mot. 1.  In support of its motion, defendant argues that plaintiffs lack standing to pursue a claim against the government in this court because subcontractors lack privity with the government–an essential element for suit.  Id. at 5.  Further, defendant emphasizes that the "agreement between the Government and Lemhi to effectuate the assignment between Lemhi and Travelers by directing that Lemhi's progress payments be transmitted to Travelers is obviously inextricably intertwined with the assignment itself."  Def.'s Reply to Second Mot. 3.  Consequently, defendant argues, because plaintiffs were not third-party beneficiaries of the Assignment, plaintiffs' status cannot change as a result of the alleged modification to the remittance clause of the Contract.  Id. at 3-4.  Defendant also dismisses plaintiffs' creditor

_____

[13]  While Nelson Construction served as the subcontractor on the Project, the court refers to both Nelson and Nelson Construction as subcontractors because Nelson is the owner of Nelson Construction.  Further, Count Three of the Amended Complaint refers to both Nelson and Nelson Construction as the parties seeking recovery.  Am. Compl. ¶¶ 37-41.  Also, for purposes of Count Three, plaintiffs pursue their claim for third-party beneficiary status in their role as subcontractors, rather than as indemnitors.

beneficiary claim, arguing that the government "made no promise to pay proceeds of a contract to [plaintiffs], nor [have plaintiffs] alleged any such promise." Def.'s Second Mot. 9.

Defendant's argument, although compelling, reveals the government's reliance on documents not in the record. It appears that the government's memorandum references a document not attached to the Amended Complaint, namely a payment modification agreement to which the government was a party. Def.'s Reply to Second Mot. 3 (referring to "[t]he agreement between the Government and Lemhi to effectuate the assignment between Lemhi and Travelers"). The government's reliance on facts or documents not of record precludes the court's dismissal of plaintiffs' third-party beneficiary claim on RCFC 12(b)(1) or 12(b)(6) grounds. To resolve the jurisdictional aspect of the government's Second Motion to Dismiss, the court must determine whether plaintiffs have set forth facts in the Amended Complaint that satisfy the requirements for third-party beneficiary status. Greenlee County, Ariz. v. United States, 487 F.3d 871, 876-77 (Fed. Cir. 2007). If the court determines that it possesses jurisdiction over Count Three, the court must then determine whether the Amended Complaint sets forth facts sufficient to support a third-party beneficiary claim. Id.

**1.  Does This Court Have Jurisdiction Over Plaintiffs' Third-Party Beneficiary Claim?**

**a.  Standard for Third-Party Beneficiary Status**

Generally, the "government consents to be sued only by those with whom it has privity of contract." Erickson Air Crane, 731 F.2d at 813; see also Anderson, 344 F.3d at 1351 (stating that a plaintiff must be in privity with the United States to have standing to sue the sovereign on a contract claim). When a plaintiff's claim is founded upon a contract, the parties to that contract must be the plaintiff and defendant. See Silverman v. United States, 679 F.2d 865, 870 (Ct. Cl. 1982).

However, when a plaintiff suing the government for breach of contract cannot establish privity with the United States, the plaintiff must establish that the claim falls within one of the exceptions to this rule in order for the complaint to withstand a jurisdictional challenge. See S. Cal. Fed. Sav. & Loan Ass'n v. United States, 422 F.3d 1319, 1328 (Fed. Cir. 2005); First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1289 (Fed. Cir. 1999); AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 527 (2003). The Federal Circuit in First Hartford held:

> [Such exceptions include suits] by an intended third-party beneficiary, by a
> subcontractor by means of a pass-through suit when the prime contractor is liable to
> the subcontractor for the subcontractor's damages,[14] and by a Miller Act surety for

---

[14]  This exception allows, in certain instances, a prime contractor to sue the government on behalf of the subcontractor. E.R. Mitchell Constr. Co. v. Danzig, 175 F.3d 1369, 1370 (Fed. Cir. 1999). In the case before the court, this exception does not apply because plaintiffs are the subcontractors.

-17-

> funds improperly disbursed to a prime contractor. However, the common thread that
> unites these exceptions is that the party standing outside of privity by contractual
> obligation stands in the shoes of a party within privity.

194 F.3d at 1289 (citations omitted) (footnote added); see also Alpine County, Cal. v. United
States, 417 F.3d 1366, 1368 (Fed. Cir. 2005) (holding that in order for a plaintiff to file suit
against the government on a contract claim in the Court of Federal Claims, a plaintiff "must have
either direct privity or third-party beneficiary status"). The third-party beneficiary status
exception allows for a claim by an intended third-party beneficiary of a government contract
against the government as a party to the contract.[15] Wagner v. United States, 71 Fed. Cl. 355,
363 (2006); see also Roedler v. Dep't of Energy, 255 F.3d 1347, 1351 (Fed. Cir. 2001) ("Third
party beneficiaries of a contract to which the United States is a party may assert a claim against
the United States, in accordance with the law governing third party claims."). However, the
third-party beneficiary status exception does not allow a claim against the government by a party
to a private contract on the assumption that the government is the intended beneficiary of a
private contract. Wagner, 71 Fed. Cl. at 363-64.

    For a plaintiff to avail itself of the third-party beneficiary exception, it must "demonstrate
that the contract not only reflects the express or implied intention to benefit [the plaintiff], but
that it reflects an intention to benefit the [plaintiff] directly." Glass v. United States, 258 F.3d
1349, 1354 (Fed. Cir. 2001); see also Roedler, 255 F.3d at 1352 (stating that the benefit to the
third party under the contract must be direct); Montana v. United States, 124 F.3d 1269, 1273
(Fed. Cir. 1997) (stating that the intended beneficiary need not be specifically identified but must
be in a class clearly intended to be benefitted). Therefore, the "intent of the parties to the
contract" becomes the "cornerstone of a claim for third-party beneficiary status." Flexfab, L.L.C.
v. United States, 424 F.3d 1254, 1259 (Fed. Cir. 2005). In addition, the court must distinguish
between incidental and indirect beneficiaries and direct beneficiaries because only direct
beneficiaries qualify for third-party beneficiary status. Schuerman v. United States, 30 Fed. Cl.
420, 433 (1994). An incidental beneficiary is "'a person who is neither the promisee of a
contract nor the party to whom performance is to be rendered [but who] will derive a benefit
from [the contract's] performance.'" Sallee v. United States, 41 Fed. Cl. 509, 515 n.7 (1998)
(citation omitted).

    In the case of a subcontractor seeking third-party beneficiary status, the Federal Circuit
has held that "the contracting officer must be put on notice, by either the contract language or the
attendant circumstances, of the relationship between the prime contractor and the third-party
subcontractor so that an intent to benefit the third party is fairly attributable to the contracting

---

[15] A particular type of third-party beneficiary, a creditor beneficiary, may be accorded full
rights under the original contract in this court. D & H Distrib. Co. v. United States, 102 F.3d
542, 547 (Fed. Cir. 1996). "[I]t has long been settled that a clause providing for the promisor to
pay the proceeds of the contract to a third-party is enforceable by the third-party where the
payment is intended to satisfy a present or future liability of the promisee to the third-party." Id.
at 546-47.

officer." <u>Flexfab</u>, 424 F.3d at 1263.  <u>Flexfab</u> further held:

> [W]e agree with the proposition that when a government agent with authority to contract on the government's behalf knows of a condition precedent to a third party's performance as a sub-contractor, such as receipt of payment directly from the government, and specifically modifies the prime contract so as to ensure the third party's continued performance, the agent and by implication the government itself necessarily intend to benefit the third party.

<u>Id.</u>

Finally, in weighing whether plaintiffs have third-party beneficiary status, the court must be "mindful of the black letter law that the United States as a sovereign may not be sued unless it consents." <u>United States v. Lee</u>, 106 U.S. 196, 207 (1882); <u>see also</u> <u>Flexfab</u>, 424 F.3d at 1260 (stating that the law that "governs third-party beneficiaries is subject to the principle that the government can only be bound by those with authorization to do so").  The Supreme Court has noted that third-party beneficiary status bestows an "exceptional privilege"; therefore, this privilege must not be granted liberally.  <u>German Alliance Ins. Co. v. Home Water Supply Co.</u>, 226 U.S. 220, 230 (1912) ("Before a stranger can avail himself of the exceptional privilege of suing for a breach of an agreement to which he is not a party, he must, at least, show that it was intended for his direct benefit.").

### b. This Court Possesses Jurisdiction Over Plaintiffs' Third-Party Beneficiary Claim.

In the case <u>sub judice</u>, Lemhi stood in privity with the government.  The party outside of privity, but by contractual obligation with the ability to step into the shoes of Lemhi pursuant to the Assignment, is Travelers.  Plaintiffs, by contrast, were not a party to any agreement or contract with the government.  Moreover, the Assignment fails to mention either plaintiff, much less specifically state that the Assignment was entered into to benefit plaintiffs.  Therefore, with all other options foreclosed, in order to establish this court's jurisdiction over their claims, plaintiffs invoke the third-party beneficiary exception.

Plaintiffs allege they are third-party beneficiaries to (1) the agreement between Lemhi and the government to modify the remittance terms of the Contract and/or (2) the Assignment, an agreement to which the government assented.  Pls.' Resp. to Second Mot. 7.  Specifically, plaintiffs assert that they are creditor beneficiaries with standing to sue the government pursuant to the Contract, as modified by the Assignment, because the government changed the payment provisions to protect the interests of plaintiffs and other subcontractors.[16]  <u>See</u> Am. Compl. ¶¶ 13, 26, 38-41; Pls.' Resp. to Second Mot. 7 (arguing that "the payee conditions of the Contract were modified to protect the interests of Nelson, [Nelson Construction,] and other subcontractors"); <u>see</u>

_____

[16] While plaintiffs were not named in the Assignment nor the remittance clause, plaintiffs argue that they "need not be specifically named in the remittance clause" in order to qualify for intended third-party beneficiary status.  Pls.' Resp. to Second Mot. 8.

also Am. Compl. ¶ 13 (stating that the government modified the payee conditions of the Contract to reflect the Assignment). The government was aware of and agreed to the modified payment terms as reflected by its making six consecutive payments to Travelers pursuant to the Assignment. Am. Compl. ¶ 15. Plaintiffs maintain that they "relied, and had a right to rely on the remaining Contract payments being made to Travelers as the escrow holder for purposes of paying" plaintiffs under the Contract. Id. ¶ 40. Further, plaintiffs argue, the FHA's CO and staff attorney had the "express or implied authority" to modify the payment provisions of the Contract for payment to Travelers in accordance with the Assignment, and plaintiffs relied upon their authority to bind the government. Id. ¶ 14. The foregoing factual allegations of the Amended Complaint, which must be accepted as true for the purpose of deciding defendant's motions, preclude dismissal at this juncture.

The decision in Norwest Bank Arizona, N.A. v. United States, 37 Fed. Cl. 605 (1997), is instructive. In Norwest, the prime contractor, Modesco, Inc. ("Modesco"), contracted with the United States Navy ("Navy") to install modular buildings. Id. at 606. Modesco subcontracted with Arizona Millwork to construct and deliver modular buildings to the site. Id. Arizona Millwork relied upon a credit line with Caliber Bank, predecessor to the plaintiff Norwest Bank Arizona, to finance performance. Id. Shortly after performance began, the subcontractor became concerned about Modesco's ability to make payments on the subcontract. Id. As a result, the subcontractor suspended performance until Modesco agreed to assign its payments to the subcontractor's bank. Id. Modesco agreed to assign the proceeds, and notified the Navy. Id.

On April 11, 1994, a contracting specialist forwarded the assignment documents to the Navy's legal department for approval, and the legal department returned the approved documents to the contracting office the following day. Id. at 607. The contracting officer acknowledged receipt of the notice of assignment on April 13, 1994. Id. Approximately two weeks later, on April 28, 1994, Modesco sent a bill to the Navy in the amount of $129,324.09. Id. On May 4, 1994, the contracting officer ratified the assignment and issued a modification to the contract naming the bank as payee. Id. The contracting specialist routed the notice of assignment with attached modification to the payment office. Id. On May 16, 1994, Modesco, in contravention of the assignment, asked the Navy's payment office to make payment to its company rather than the bank. Id. The following day, May 17, 1994, the Navy's payment office received the modification with the attached notice of assignment; and on that same day, the Navy issued a check to Modesco. Id. Modesco cashed the check on May 23, 1994, and then filed for bankruptcy. Id.

Subsequent to Modesco absconding with government funds, the bank required the subcontractor to satisfy the debt. Id. The subcontractor complied and filed suit in this court based upon the government's wrongful payment. Id. In ruling for the plaintiff-subcontractor, the court reasoned that the prime contractor and the government shared the intention that the buildings be installed for the benefit of the Navy. Id. at 609. To effectuate their intentions, the parties allowed the subcontractor's bank to receive payment under the prime contract. Id. The court reasoned that without the assignment of payments, the prime contract would not have been

completed.  Id.; see also id. (noting that "[h]ad Arizona Millwork not been assured that the contract would be modified, the modules would not have been delivered to Modesco").  The court determined:

> Modesco agreed to assign its payments to satisfy "a present or future liability of the promisee to the third party."  As a party to the subcontract, Modesco could be held liable to Arizona Millwork for failure to make payment.  Modesco assigned its payments to the subcontractor's bank with the intent to discharge or prevent any present or future liability to Arizona Millwork.  Thus, Arizona Millwork is a "creditor beneficiary and [should be] accorded full rights to sue under the original contract."  The modification solidified the subcontractor's right to enforce the Government's obligation to pay the Bank.

Id. at 609 (internal citations omitted).[17]

Similarly, in the instant case, soon after performance on the Contract began, plaintiffs became concerned that they would not receive payment from Lemhi and Ariwite.  Am. Compl. ¶ 8.  Accordingly, plaintiffs informed the government, Lemhi, and Travelers that they "would perform no further work on the Project unless alternative payment arrangements were made."  Id. ¶ 11.  As in Norwest, Lemhi and the government both shared the intent to complete work on the Contract; and, arguably, Travelers shared a similar intent[18]–to have the work completed and the

---

[17]  In Norwest, subcontractor Arizona Millwork was the original plaintiff.  37 Fed. Cl. at 608.  Both the bank and the subcontractor retained the same counsel and asserted identical interests.  Id.  The bank agreed to forward any judgment amount obtained from the Court of Federal Claims litigation to the subcontractor.  Id.  This aspect of Norwest differs from the case sub judice.  Travelers, the assignee, is not a plaintiff in the instant case.  However, because Travelers is not suing the government for the settlement amount that the government paid Lemhi, it is reasonable to infer that no Miller Act claims are pending against Travelers.

[18]  During oral argument, defendant asserted that the government's intent was not the same as Travelers' intent.  Tr. II at 9.  Specifically, defendant argued that the government "in the broadest sense doesn't care if the subcontractors are paid or not."  Id.  Thus, defendant contended that if plaintiffs "walk[ed] off," the government could reprocure because the surety would pay the cost of performance, and there are "hundreds of contractors the government could turn to as a reprocurement contractor or a takeover contractor to complete this project."  Id.  Plaintiffs responded that the government knew that "Nelson was essential to the completion of the project," and "there were maybe one, maybe two other contractors capable of performing this work in the time frame that was required by the government."  Id. at 32-33.  However, counsels' assertions at argument are not evidence that the court can consider.  No admissible evidence was presented concerning the number of contractors capable of completing the work required by the Contract at issue.  Moreover, the question before the court is whether plaintiffs' Amended Complaint can survive defendant's jurisdictional attack; thus, the court did not consider counsels' references to factual matters outside the Amended Complaint.

subcontractors paid to avoid claims on the payment and performance bonds.[19]  Additionally, because plaintiffs refused to perform, Lemhi agreed to assign its right to payment under the Contract to Travelers.  While in the instant case the assignee, Travelers, was the performance and payment bond surety, rather than the subcontractor's bank as in Norwest, there is no significance as to the assignee's identity because in both cases the assignee, arguably, received payment to ensure the subcontractor's performance.[20]

Case law clearly provides that a subcontractor can establish third-party beneficiary status when the contract's remittance clause has been modified for the intended benefit of the subcontractor.  See D & H Distrib., 102 F.3d at 546-47 (ruling that the subcontractor was a third-

---

[19]  Similarly, in D & H Distributing, the parties' intent was at issue when the subcontractor voiced its concern that the prime contractor might fail to pay it, and requested alternative payment arrangements to ensure continuing performance.  102 F.3d at 544, 546-47. The Federal Circuit in D & H Distributing held that a subcontractor was an intended third-party beneficiary of a contract between the prime contractor and the government because the contracting officer approved of an arrangement to make the subcontractor a joint payee under the contract. Id.  The Federal Circuit ruled that even though D & H was not a party to the contract, it was permitted to enforce the modified payee clause against the government as a third-party beneficiary. Id. at 546.  Because the modified clause provided for the government to pay the proceeds of the contract to D & H, D & H could enforce the clause since "payment is intended to satisfy a present or future liability of the promisee [contractor] to the third party." Id. at 546-47. The Federal Circuit explained that the "third party beneficiary in [this] situation has traditionally been referred to as a 'creditor beneficiary' and has been accorded full rights to sue under the original contract." Id. at 547.

In contrast to the subcontractor in D & H Distributing, plaintiffs in the instant case were not designated joint payees for the proceeds of the contract.  However, in both D & H Distributing and the case sub judice, the subcontractors asked their prime contractors to make arrangements that would ensure their receipt of payment.  Thus, it seems clear that because plaintiffs in this case put the government, Lemhi, and Travelers on notice that they would not proceed with the Project without assurance of payment, i.e., progress payments would be made to Travelers, the Assignment was consummated between Travelers and Lemhi, and accepted by the government, all with the intent of benefitting plaintiffs and the government.  Plaintiffs benefitted because they would, so they believed, be guaranteed to be paid for their work, and the government benefitted because it did not have to default Lemhi and find a replacement contractor.

[20]  Defendant asserts that a subcontractor can only establish third-party beneficiary status when the contract's remittance clause was changed to name the subcontractor "or an entity that is the functional equivalent of the subcontractor, such as the subcontractor's bank." Def.'s Reply to Pls.' Resp. to Second Mot. 4.  However, in Norwest, while the subcontractor's bank was named as the payee, the subcontractor did not have control over the payments, and as noted above, the bank required the subcontractor to satisfy its obligations. 37 Fed. Cl. at 607.

party beneficiary because the contracting officer issued a contract modification making the prime contractor and the subcontractor joint payees for proceeds of the contract).  Compare JGB Enters., Inc. v. United States, 63 Fed. Cl. 319, 334 (2004) (ruling that the subcontractor was a third-party beneficiary to the remittance clause of the contract because although the subcontractor was not named as a joint payee, the contracting officer understood that the "entire purpose of modifying the remittance clause was to provide protection for the supplier/subcontractor by giving it the right to control the disbursement of the contract proceeds"), with id. at 334-35 (ruling that, with respect to another contract, the subcontractor failed to establish third-party beneficiary status because neither the prime contractor nor the subcontractor notified the contracting officer that the purpose of modifying the remittance clause was to assure the subcontractor that it would receive payment).  Similarly, when the government modifies a contract pursuant to and/or acts in accordance with an assignment agreement, the government expressly agrees to the assignment.  See Summerfield Housing Ltd. P'ship v. United States, 42 Fed. Cl. 160, 173 (1998) (finding that by modifying the contract with the name of the assignee and by incorporating the notice of assignment, the government expressly agreed to the assignment); Norwest, 37 Fed. Cl. at 610 (holding that when the contracting officer modified the contract to name the contractor's bank as payee, the contracting officer's actions demonstrated an express agreement to pay the bank).

In the case sub judice, plaintiffs contend, and the court must accept as true for purposes of the government's Second Motion to Dismiss, that the FHA's CO and/or staff attorney modified the payee terms of the Contract to make future payments to Travelers for the intended benefit of plaintiffs.  Am. Compl. ¶¶ 13-14.  Because the FHA's CO and the staff attorney possessed the authority to bind the government, plaintiffs relied upon this authority to guarantee that they would receive payment for their work, albeit from Travelers.  Id.  Additionally, plaintiffs aver that the government made six consecutive payments to Travelers pursuant to the Assignment, and that plaintiffs relied upon the government's conduct to ensure that they would be paid.  Id. ¶ 40.  Reading all of their averments together, plaintiffs argue that their factual allegations suffice to defeat defendant's Second Motion to Dismiss.  Tr. II at 22 (arguing that "all of the inferences must be taken from paragraphs 11 through 14 [of the Amended Complaint] in favor of Nelson").  Plaintiffs are correct.  Accordingly, the court finds that plaintiffs' allegations are sufficient to overcome defendant's RCFC 12(b)(1) jurisdictional attack on plaintiffs' third-party beneficiary claim, and defendant's Second Motion to Dismiss as to RCFC 12(b)(1) is denied.

### 2.  Have Plaintiffs Pled Facts Sufficient to State a Claim?

The court must next determine whether plaintiffs have pled sufficient facts to state a claim.  RCFC 12(b)(6).  Accepting plaintiffs' well-pled factual allegations as true, the court must determine not whether plaintiffs' claim will succeed, but, rather, whether plaintiffs are entitled to offer evidence to support their claim.  See Swierkiewicz, 534 U.S. at 511.  Plaintiffs contend that the discovery process will reveal documents that evidence the government's intent to benefit plaintiffs as third-party beneficiaries.  Pls.' Resp. to Second Mot. 7 n.2.  In defendant's view, the parol evidence rule bars plaintiffs from introducing extrinsic evidence in an attempt to interpret

-23-

the plain meaning of the Contract.  Def.'s Notice 1.  Thus, defendant argues that plaintiffs must establish third-party beneficiary status by relying solely on the intent or the words of the Contract.  Def.'s Second Mot. 8.  According to defendant, plaintiffs fail to establish that they are intended third-party beneficiaries because the Contract does not express an intent to benefit them; thus, parol evidence must be excluded from the court's consideration.  Def.'s Reply 1-2.

Generally, when "construing a contract, a court first examines the plain meaning of its express terms."  Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004). Pursuant to the parol evidence rule, the court is prohibited from relying upon extrinsic evidence that pre-dates a written agreement "to add to or otherwise modify the terms of a written agreement 'in instances where the written agreement has been adopted by the parties as an expression of their final understanding.'"  Id. (citation omitted).  However, extrinsic evidence such as prior agreements and documents will be considered part of a contract when they are incorporated into the contract.  See S. Cal. Fed. Sav. & Loan Ass'n, 422 F.3d at 1330.  The party asserting that the parol evidence rule bars extrinsic evidence must first: (1) establish that the writing was a final agreement, and that the parties intended it to be the final evidence of their agreement, and (2) establish that the final writing was a complete integration of the agreement. Design & Prod., Inc. v. United States, 18 Cl. Ct. 168, 195 (1989).  To determine whether a writing was fully integrated, the court must examine both the writings and the circumstances surrounding their adoption.  See id.

However, in the case sub judice, the parol evidence rule has no application at this early juncture.  Plaintiffs' well-pled facts must be accepted as true.  Nevertheless, the court notes that thus far, the two writings associated with the government's acceptance of the Assignment are the alleged modified remittance clause,[21] Am. Compl. ¶¶ 13-14, and the Notice of Assignment that bears a stamp reflecting receipt by the FHA on May 28, 2002, at 12:47 p.m., id. Ex. C.  Aside from any writings, the government made six consecutive payments to Travelers from June 2002 until November 2002, pursuant to the Assignment.  Id. ¶ 15.  Case law has held that it is the totality of the circumstances that establish whether the government accepted an assignment.  See Tuftco, 614 F.2d at 745 (ruling that the government had waived protection under the Assignment of Contract Act because the contracting officer wrote "Assignment acknowledged" at the bottom of the notification letter from the assignor); Am. Fin. Assocs., Ltd. v. United States, 5 Cl. Ct. 761, 771-72 (1984) (holding that an assignment was recognized by the government because the government issued a check, made payable to the assignee, as payment under the contract).

In the instant case, plaintiffs aver that the government modified the remittance clause of the Contract, acknowledged receipt of the Assignment, and acted pursuant to the Assignment;

---

[21]   During oral argument, defendant asserted that a modified remittance clause does not exist.  Tr. II at 35.  However, the Amended Complaint avers that the government modified "the payee conditions of the Contract to reflect the Assignment."  Am. Compl. ¶ 13.  In ruling on defendant's motions to dismiss, the court must accept as true plaintiffs' factual allegations. Nothing herein precludes defendant from moving for summary judgment and countering plaintiffs' averments with documents and affidavits.

thus, it is the aggregate of these two writings and the government's actions that establish the government's acceptance of the Assignment.  If accurate, by their nature, the two writings and the government's actions are extrinsic to the Contract, and do not constitute a fully integrated written agreement.  Additionally, based upon plaintiffs' factual allegations, the circumstances surrounding the Assignment reflect that: (1) plaintiffs notified the government, Travelers, and Lemhi that they would not continue work on the Project until their interests were protected; (2) Lemhi and Travelers then entered into an assignment agreement to protect plaintiffs; (3) the government acknowledged receipt of the Assignment; (4) the government modified the payment term of the Contract; and (5) the government made six consecutive payments to Travelers pursuant to the Assignment and the modified payment term of the Contract.  Thus, the court finds that plaintiffs have pled sufficient facts that entitle them to offer evidence in support their claims.  Accordingly, defendant's Second Motion to Dismiss on RCFC 12(b)(6) grounds is denied.

## IV.  CONCLUSION

For the reasons stated above:

1.      **Defendant's Motion to Dismiss Counts One and Two of the Amended Complaint is GRANTED.**

2.      **Defendant's Motion to Dismiss Count Three of the Amended Complaint is DENIED.**

3.      **The parties shall file a joint status report no later than Friday, November 16, 2007, suggesting further proceedings.**


**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge